**The QUIKRETE COMPANIES, INC., Plaintiff,**

**v.**

**NOMIX CORPORATION, Defendant.**

**NOMIX CORPORATION, Plaintiff,**

**v.**

**The QUIKRETE COMPANIES, INC., Defendant.**

**Civ. A. Nos. 1:88–CV–1080–JTC, 1:89–CV–1177–JTC.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 17, 1993.

William H. Needle, Needle & Rosenberg, Thomas W. Rhodes, Edward H. Wasmuth, Jr., Smith, Gambrell & Russell, Atlanta, GA, for Quikrete.

Paul J. Murphy, Hunton & Williams, Atlanta, GA, Michael E. Zall, Edward R. Weingram, Michael R. Friscia, William J. Barber, Weingram & Zall, Maywood, NJ, Carol E. Kirby, AT & T Law Div., David R. Aufdenspring, Dean S. Daskal, Thomas S. Richey, Powell, Goldstein, Frazier & Murphy, Atlanta, GA, for Nomix.

## *ORDER*

CAMP, District Judge.

This order addresses a motion by The Quikrete Companies, Inc. ["Quikrete"] for judgment as a matter of law or for a new trial and for expedited consideration [# 166 in 89–CV–1177, # 254 in 88–CV–1080]; and a motion for a protective order [184/271]. This order also concerns motions by Nomix Corporation ["Nomix"] for prejudgment interest [162/250]; for enhanced damages and attorney's fees [163/251]; for a permanent injunction [165/253]; for an accounting of infringing sales [167/255]; and for expedited consideration [173/261]; and a Nomix itemization of costs [174/262].

This opinion addresses one issue raised by Quikrete's motion for judgment as a matter of law: whether Nomix's conduct before the Patent and Trademark Office ["PTO"] rendered the patents in suit unenforceable. Because the Court concludes that it did, the Court **GRANTS** Quikrete's motion. The Court has carefully considered but does not here address Quikrete's many other arguments.

***Background***

This case involves composition and use patents for a type of concrete.

### 1. Concrete in general

Concrete is a combination of cement and coarse aggregate, either sand, gravel, or crushed stone. Cement is a composition of ingredients such as lime and gypsum that gels into a solid mass in the presence of water. Adding coarse aggregate makes this mass harder and less brittle, and thus better suited for most uses.

The typical way to make concrete is to mix the cement and aggregate, and then combine this dry "cementitious compound" with water shortly before use. The user then pours this hydrated mixture into a hole or mold or onto a surface, where it hardens.

### 2. Babcock's invention

In the mid–1980's, H. Nash Babcock, an engineer and inventor, began trying to develop a special type of concrete mix. His goal was to create a cementitious compound and method of using it that would not require mixing with water before being poured.

In March, 1986, Babcock and a co-inventor filed patent applications with the PTO, assigning their rights to Nomix. These applications concerned special fast-setting formulations of dry cementitious compounds that the user could simply pour into water, and that would then cure into usable concrete without any mixing.

Nomix encountered some difficulty getting its patents approved. In October, 1986, and

again in March, 1987, an examiner rejected Nomix's initial applications for the patents in this suit as obvious under 35 U.S.C. § 103. Nomix amended its applications and persisted.

### 3. The Kutach rejection

Meanwhile, Nomix was pursuing another related patent application, involving pouring dry concrete mix into a mold (rather than a hole) filled with water. In January, 1986, one Examiner Kutach preliminarily rejected this application. In part, she based her decision on the Lake Patent, No. 743,525 (issued Nov. 10, 1903).

The Lake Patent discloses a process for making artificial stone out of concrete. This process involves pouring dry cement mix into a lubricated mold containing water. As the mixture is poured in, the water rises along the mold's sides. In the end, about half an inch of water remains on top. This process does not involve any separate mixing. Wrote Kutach,

> Lake teaches the basic process as claimed by applicant in which a dry cementitious mixture is fed to a mold after the mold has been previously filled with an excess of water needed for the hydration of the cementitious mixture without any type of physical mixing of the cementitious mixture with the water. With respect to the proportions of materials forming the cementitious mixture, Lake teaches having from five parts stone or sand mixed with one part cement to one part stone or sand mixed with five parts cement. Therefore, applicant's claimed proportions of cement binder are well within the purview of Lake. The secondary references are cited to show that it is generally well known and conventional in the art to provide the various particles of cementitious mixture with similar characteristics such that the various particles do not separate from each other when being added to water.

Pl.Exh. 20 (1/27/88 office action at 4).

Nomix sent Kutach a response.[1] But Nomix did not mention the Lake Patent to the other examiners reviewing Nomix's other applications.

### 4. The patents

In March and May, 1988, the PTO issued the patents involved in this suit. Patent No. 4,747,878 [the " '878 patent"] claims various cementitious compositions, and Patents No. 4,732,781 [the " '781 patent"] and No. 4,732,-782 [the " '782 patent"] claim methods for using these compositions.

Essentially, these patents involve mixtures of "finely divided particles" containing at least 20 percent by weight of cement binder. The "major portion" of these particles must have "approximately the same drop rate", so that the material does not segregate—i.e., divide up with the heavy aggregate at the bottom and the lighter cement at the top—when poured through water.

The claimed mix must also contain compounds that will allow it to absorb at least 50 percent of its own volume of water. One uses this invention by first "saturating a substrate with water in substantial excess of that needed for hydration", and then pouring in the dry mix.

In a section describing the invention's background, these patents each declare,

> At present, it is essential that all cementitious compositions are mixed with water before placement in order to obtain the proper characteristics of the final product. Some type of mixing is and has always been required.... Cementitious mixtures could not be placed in a dry state directly into water or on to a wet surface without first wetting and mixing the dry ingredients.

This was Nomix's position throughout the application process.

### 5. The dispute with Quikrete

Nomix began marketing its inventions before these patents issued. In March, 1987, Nomix introduced a packaged dry mix called "PostSet" at a Chicago trade show. Nomix intended this product to help homeowners and others set fence posts without mixing. Among those attending the show were execu-

1. Ultimately, the PTO granted the application for this related patent, No. 4839115.

tives of Quikrete, an Atlanta-based manufacturer and licenser of packaged cement.

Quikrete developed a product that competed with PostSet, which Quikrete called Fast Setting Concrete ["QFSC"] and originally sold in a red bag.

In March, 1988, Nomix sent letters to Quikrete manufacturers and other in the trade to notify them that the PTO would soon issue the first of Nomix's patents. These letters warned, "We are ready and willing to license you to manufacture our patented PostSet product, but we must also protect our patents.... [W]e ask that you stop supplying your customers with a product that will infringe on our patents."

In May, 1988, Quikrete filed a declaratory judgment action alleging that the '781 and '782 patents were invalid. Quikrete later added the '878 patent to its complaint. Nomix filed its own suit in July, alleging that QFSC infringed the '781 and '878 patents. This Court consolidated these two cases.

#### 6. The reissue applications

Soon after discovery closed in this litigation, Nomix applied to the PTO to reissue its three patents. In its reissue applications Nomix disclosed, among other things, the existence of the Lake Patent. In September, 1990, a patent examiner recommended rejecting all the claims of the '878 patent. This examiner, David Brunsman, rejected some of these claims partly on the grounds that the Lake Patent had anticipated them or rendered them obvious.

Before any examiner made preliminary findings concerning the other two patents and before the PTO took any final action, Nomix withdrew its reissue applications.

#### 7. The inequitable conduct claims

At trial, Quikrete claimed that Nomix committed "inequitable conduct" by intentionally withholding material information from the PTO during the application process. However, the Court excluded all evidence of the reissue proceedings, at Nomix's request and over Quikrete's strenuous objection.

The jury found for Nomix on the inequitable conduct issue. Now Quikrete argues that the Court should overturn the jury's verdict. Quikrete contends that Nomix's failure to inform the examiners who reviewed its '781, '782 and '878 applications of the existence of the Lake Patent makes these patents unenforceable.

## *Discussion*

### I. Quikrete's Motion for Judgment as a Matter of Law

#### A. The standard for decision

The United States Court of Appeals for the Federal Circuit has appellate jurisdiction over any case in which jurisdiction depends in part on 28 U.S.C. § 1338 (patents). 28 U.S.C. § 1295.

The Federal Circuit uses the law of the forum circuit to determine the proper standard for judgment as a matter of law. *Moxness Prods. v. Xomed, Inc.*, 891 F.2d 890, 892, 13 U.S.P.Q.2d 1169 (Fed.Cir.1989). In the Eleventh Circuit, "[T]he court should consider all the evidence in a light most favorable to the non-movant and grant a judgment n.o.v. only if the facts and inferences point overwhelmingly in favor of the movant such that there can be but one reasonable conclusion." *Landsman Packing Co. v. Continental Can Co.*, 864 F.2d 721, 732 (11th Cir.1989).

In ruling on a motion for judgment as a matter of law, a district court must first consider all the evidence in a light most favorable to the non-mover, and draw all reasonable inferences in the non-movant's favor, without making credibility determinations or substituting its choice between conflicting pieces of evidence for the jury's. *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1512–13, 220 U.S.P.Q. 929 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984); *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1546, 220 U.S.P.Q. 193 (Fed.Cir.1983). After doing this, the district court shall then grant JNOV if (1) reasonable persons could not in light of this evidence have found the facts necessary to support the jury's verdict, or (2) the facts properly found cannot in law support that verdict. *Railroad Dynamics*, 727 F.2d at

1513. That is, the Court must grant JNOV either if the jury made an aberrant finding of fact, or if the jury's proper fact findings cannot support its legal conclusion.

In either case, the court must take care to consider only the substantial evidence supporting the jury's findings. Only if there is none may the court go on to consider evidence contrary to it. *See Orthokinetics Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1572, 1 U.S.P.Q.2d 1081 (Fed.Cir.1986). The Supreme Court has defined "substantial evidence" as "more than a scintilla.... It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).

### B. Unenforceability

If a defendant in a patent suit proves that the patent holder procured the patent inequitably, then the patent is unenforceable. One way to prove this is to show that the inventor or his attorney *intentionally* withheld *material* information from the PTO. *E.g. J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1560, 223 U.S.P.Q. 1089 (Fed.Cir.1984). The duty to disclose material information lasts throughout the patent process. *Fox Industs. v. Structural Preservation Sys.*, 922 F.2d 801, 803, 17 U.S.P.Q.2d 1579 (Fed.Cir.1990). The party claiming that the patents in suit are unenforceable has the burden of proving this clearly and convincingly. 37 C.F.R. § 1.56(a).

#### 1. Materiality

A starting point for determining whether a reference is material is to examine whether there is a "substantial likelihood that a reasonable examiner would have considered the omitted reference ... important in deciding whether to allow the application to issue as a patent." *J.P. Stevens*, 747 F.2d at 1559. "Merely cumulative" information is not material. *Id.* at 1560.

If an applicant withholds a reference and the examiner grants the patent application, but the examiner then changes her mind and recommends denying reissue of the patent after later learning of the withheld reference, this is strong evidence that the withheld reference was in fact material. *Stevens*, 747 F.2d at 1562. If the reissue examiner relied on the withheld evidence to reject the reissue application, this shows the withheld evidence was clearly important to the examiner. *Id.* This "alone" establishes the reference's materiality if the reissue rejection was "reasonable". *Id.* Indeed, such circumstances establish materiality so conclusively that they justify rejecting a contrary finding by the trier of fact. *See id.* at 1557, 1562–63.

Here, Nomix does not dispute that Examiner Brunsman rejected the '878 reissue partly in reliance on the withheld Lake Patent.[2] Thus Quikrete has undeniably shown that the evidence was "clearly important" to the rejection decision. Thus the information was material if the rejection was reasonable.

Nomix has not argued that Examiner Brunsman's decision was unreasonable. Nomix does argue that the Lake Patent differs from Nomix's invention for four reasons.[3] These arguments may have some merit. But they do not prove Nomix's point so clearly that an examiner would be unreasonable to disagree.

Brunsman did disagree. Thus, Quikrete has shown that no reasonable finder of fact could conclude that the Lake Patent was not material to Nomix's applications for the patents in suit.

2. Though no examiner made any decision concerning reissue of the other two patents in suit, the claims of the '878 patent that Brunsman rejected as obvious over Lake are substantially the same as analogous claims in the other two patents.

3. Nomix first argues that the Lake Patent attributes no importance to whether cement is fed into the mold either dry or wet; second, that the mixture becomes hydrated partly by absorbing the one-half inch of water left on top after pouring; third, that Lake does not disclose adjusting drop rates; and fourth, that Lake does not teach using fast-setting cement. Br.Op. JMOL 41–42; *see also* Tr. Babcock test. (12/3/92) at 46–47 (explaining why Babcock did not consider Lake Patent pertinent).

### 2. Intent

This does not end the inquiry. Even if the Lake Patent was material to Nomix's application, Nomix may still enforce its patents unless Nomix withheld the Lake Patent intentionally.

#### a. The degree of intent required

The *Stevens* panel held that gross negligence satisfied this intent requirement. In fact, *Stevens* suggested that ordinary negligence sufficed. 747 F.2d at 1560. "Gross negligence is present when the actor, judged as a reasonably prudent person in his position, should have known of the materiality of a withheld reference." *Id.*

However, other Federal Circuit panels held that even gross negligence did not by itself suffice to show intent. Instead, they required some greater degree of culpability. *See, e.g., FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 n. 9, 5 U.S.P.Q.2d 1112 (Fed. Cir.1987).

In 1988, the Federal Circuit resolved this conflict by ruling that gross negligence indeed is not enough. *Kingsdown Medical Consultants v. Hollister Inc.*, 863 F.2d 867, 876, 9 U.S.P.Q.2d 1384 (Fed.Cir.1988) (partially en banc), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). Instead, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown*, 863 F.2d at 876 (citing *Norton v. Curtiss*, 433 F.2d 779, 167 U.S.P.Q. 532 (CCPA 1970)).

Thus, the *FMC* panel's view on this matter was correct. In *FMC*, the court held that one alleging "failure to disclose" type inequitable conduct must prove clearly: (1) prior art exists that is material; (2) that the applicant or his attorney knew of this art and that it was material; and (3) that applicant failed to disclose it because of "an intent to mislead" the PTO. Other Federal Circuit cases have added that the degree of "intent to mislead" that triggers culpability varies. Finding the precise amount required in a particular case involves balancing culpability against materiality. *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435, 1439–40, 17 U.S.P.Q.2d 1834 (Fed.Cir. 1991) (citations omitted).

#### b. Establishing intent

Though *FMC* and *Kingsdown* state a general rule, this rule can be difficult to apply. The finder of fact must consider all the circumstances, including any indicating good faith.

To aid this determination, the Federal Circuit has adopted the general principle that one may infer intent from acts the natural consequences of which the actor presumably intended. *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1577, 228 U.S.P.Q. 32 (Fed.Cir.1985). Of course, the actor may rebut this presumption by showing subjective good faith. But under *FMC*, the showing he must make to do this will depend in part on his objective negligence:

> [A] patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish "subjective good faith" sufficient to prevent the drawing of an inference of intent to mislead. *A mere denial of intent to mislead* (which would defeat every effort to establish inequitable conduct) *will not suffice* in such circumstances.

*FMC*, 835 F.2d at 1416 (emphasis added); *see also Paragon Podiatry Lab. v. KLM Labs.*, 984 F.2d 1182, 1191, 25 U.S.P.Q.2d 1561 (Fed.Cir.1993) (per curiam) ("bare declaration" of lack of intent to deceive when false affidavit filed does not raise genuine issue of fact for summary judgment).

Thus, if an applicant knew or should have known that a reference was material, then he must come up with something more than his own averment of good faith to show lack of intent. Part of the inquiry here, then, is whether Nomix and Babcock should have known that the Lake Patent was material when they decided not to disclose it to the examiners reviewing their applications for the patents in suit.

*Stevens* illustrates one circumstance in which an applicant should have known a prior reference was material. Where no prior art cited in the prosecution taught a key element of the claimed process, but a withheld reference did, the applicant "should have known those references would be important to the PTO". The *Stevens* court thus

found that the district court's finding that the applicant did not withhold information "intentionally" was clearly erroneous. 747 F.2d at 1564.

The three patents here in suit specifically declare, "Some type of mixing is and has always been required." The Lake Patent involved a method of pouring a cementitious compound that did not require mixing. The Lake Patent thus involved a key element that other art did not, at least according to Nomix. This establishes beyond any reasonable question that Nomix and its attorneys should have known the Lake Patent was material.

Given this, a "mere denial" or "bare declaration" of good faith cannot rebut an inference of intent. But here, the only direct evidence of Babcock's subjective good faith is Babcock's own testimony. That will not do.

In fact, even Babcock's own testimony was equivocal. Babcock at one point insisted that he *had* disclosed the Lake Patent to the examiners reviewing the applications for the patents in suit. Tr. 12/3/92 (Babcock cross examination) at 12. He then testified that Nomix decided not to mention the patent because "it was declared non-pertinent". *Id.* at 15. That is, he, his co-inventor, and his lawyer decided that it was not pertinent to the application. *Id.* at 15, 46–47. Babcock did not testify that he believed *no* examiner could reasonably have found the Lake Patent relevant; rather, he only testified that *he* did not believe the patent relevant.

There is no significant circumstantial evidence of good faith. Indeed, the circumstantial evidence suggests the contrary. Babcock was an already-experienced inventor represented by experienced attorneys. He had also just launched a business enterprise that would encounter serious competition unless its products were patent-protected. He or his attorney knew at the time that Examiner Kutach considered the Lake Patent relevant to a related application, and that Kutach had specifically found that the Lake Patent embodied certain key steps in the Nomix invention.

### 3. Conclusion

No substantial evidence exists sufficient to support Nomix's claim that it did not intentionally withhold material information. Evidence to the contrary does exist, sufficient by itself to show clearly and convincingly that Nomix did intentionally withhold highly material information from the patent office. Thus, Quikrete has met its judgment as a matter of law burden, and the patents in suit are unenforceable.

### 4. Judge or Jury?

Indeed, Quikrete may have exceeded what was required of it. Quikrete may not have needed to meet the exacting standard for judgment as a matter of law, but instead may only have been required to show inequitable conduct by clear and convincing evidence.

In a 1991 decision, the Federal Circuit stated that a district court could submit the ultimate question of whether inequitable conduct occurred to the jury. *Tol–O–Matic v. Proma Produkt–Und Marketing Gesellschaft,* 945 F.2d 1546, 1553, 20 U.S.P.Q.2d 1332 (Fed.Cir.1991). This Court chose to do so in this case.

However, there are two reasons to believe that the Court must instead make this decision on its own.

First, the Federal Circuit reaffirmed shortly after the trial of this case that there is no Seventh Amendment right to a jury trial on the defense of inequitable conduct. *Paragon Podiatry,* 984 F.2d at 1190. The court went farther, stating that the jury may not decide this issue. *Id.* (citations omitted). Rather, "the decision respecting inequitable conduct is a discretionary decision to be made by the judge on his or her own factual findings". *Id.* (citing *Gardco Mfg., Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1211–13 (Fed.Cir.1987)).

Second, the Court at Nomix's request kept from the jury any evidence concerning the reissue proceeding. The Court did so because this evidence lacked much probative value on the hotly-contested issue of obviousness: it represented only one more hearsay expert opinion, albeit an unbiased one. However, this evidence was not hearsay on the issue of inequitable conduct. The examiner's decision that the Lake Patent made some of Nomix's claims obvious indicated that a rea-

sonable examiner considered this information important, regardless of whether the examiner's decision was correct.

Nomix's request to keep this evidence from the jury may have made it impossible for the jury to decide the inequitable conduct issue, thus leaving it for the Court. If so, the conclusion discussed above applies *a fortiori.*

**C. Conclusion**

This decision has not been an easy one. Whatever else one may say about Nomix's inventions, they certainly represent an advance on technology and methods in general use before. Nonetheless, the Court **GRANTS** Quikrete's motion for judgment as a matter of law [# 166 in 89-CV-1177, # 254 in 88-CV-1080], and **DECLARES** that Nomix's patents in this action, numbers 4,747,878; 4,732,781; and 4,732,782, are unenforceable. The Court **DENIES** all other motions pending in these two cases as moot.

**SO ORDERED.**