**BRASSELER U.S.A., I, L.P., Plaintiff,**

v.

**STRYKER SALES CORPORATION and Stryker Corporation, Defendants.**

**No. CV 497–184.**

United States District Court, S.D. Georgia, Savannah Division.

Dec. 30, 1999.

Geoffrey A. Baker, Timothy J. Malloy, Gregory J. Vogler, McAndrews, Held & Malloy, LTD, Chicago, IL, for defendant.

Glen M. Darbyshire, Inglesby, Falligant, Horne, Courington & Chisholm, PC, Savannah, GA, for counterdefendant.

J.D. Fleming, Jr., John L. North, Sutherland, Asbill & Brennan, LLP, Atlanta, GA, for counterdefendant.

Cindy Leigh McAfee, Hunter, Maclean, Exley & Dunn, Savannah, GA, for plaintiff.

Timothy M. O'Brien, Patrick T. O'Connor, Oliver, Maner & Gray, Savannah, GA, for plaintiff.

Paul W. Painter, Jr., Ellis, Painter, Ratterree & Bart, LLP, Savannah, GA, for counterclaimant.

Alex J. Simmons, Jr., Schreeder, Wheeler & Flint, Atlanta, GA, for defendant.

### ORDER

EDENFIELD, District Judge.

## I. INTRODUCTION

In this patent-infringement case, the accused infringers—defendants Stryker Corporation and Stryker Sales Corporation (collectively, Stryker)—successfully raised 35 U.S.C. § 102(b)'s "on-sale" defense. Stryker, claimed that plaintiff Brasseler, U.S.A. I, L.P.'s (Brasseler's) patent for surgical saw blades is invalid because the blades' inventors sold them—in violation of § 102(b)—more than one year before Brasseler filed its patent application.

Brasseler insisted that no such sale occurred. Because the evidence showed that it did, the Court granted Stryker summary judgment on this issue, and the Federal Circuit affirmed. *Brasseler U.S.A. I., L.P. v. Stryker Sales Corp.*, 182 F.3d 888 (Fed. Cir.1999). Stryker now moves, over Brasseler's opposition, for an award of attorney fees. Doc. # 74. Under 35 U.S.C. § 285, Stryker can recover them only if "exceptional circumstances" exist. *Brasseler*, 182

F.3d at 892. The parties contest whether they do.

## II. BACKGROUND

The "exceptional circumstances" Stryker must show are reasonably demanding, and warrant a brief review of 35 U.S.C. § 102(b)'s "on-sale" provision. As the Federal Circuit previously explained, that provision

> represents a balance of the policies of allowing the inventor a reasonable amount of time to ascertain the commercial value of an invention, while requiring prompt entry into the patent system after sales activity has begun. Thus, the statute limits the period of commercial sale or offers for sale of an invention to *one year, before* the application must be filed[,] or be forever barred.

*Seal–Flex, Inc. v. Athletic Track and Court Constr.*, 98 F.3d 1318, 1322 (Fed.Cir. 1996) (cite omitted; emphasis added).

It does not take much for an inventor to cross § 102(b)'s one-year, statutory limit. *See Dawn Equip. Co. v. Micro-Trak Sys., Inc.*, 186 F.3d 981, 989 (7th Cir.1999) (it does not require an actual sale, only activity by the inventor or his company in attempting to sell the patented idea); *Linear Tech. Corp. v. Micrel, Inc.*, 63 F.Supp.2d 1103, 1125 (N.D.Cal. 1999) (Patentee's active promotion of electronic device incorporating switching voltage regulator invention among its sales representatives, distributors, and end-user customers, and its receipt of orders from distributors, more than one year before filing of patent application, constituted offers for sale, precluding patentability, even though patentee did not actually ship samples or formally book orders until after critical date).

Stryker showed that Brasseler crossed that line. *Brasseler*, 182 F.3d at 889. Brasseler unsuccessfully urged this Court to recognize no sale due to the existence of "special facts and circumstances" (that the inventors were associated with either the buyer or seller, the parties were joint developers, etc.). It in part relied on the "totality of the circumstances" test, "under

which all of the circumstances surrounding the sale are considered and weighed against the 'policies' underlying § 102(b)." *Id.*

However, after the case left this Court, the U.S. Supreme Court rejected that test in favor of a two-part test: "First, the product must be the subject of a commercial offer for sale .... [and s]econd, the invention must be ready for patenting." *Pfaff v. Wells Elecs. Inc.*, 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). The "ready for patenting" component can be satisfied either "by proof of reduction to practice[1] before the critical date; or by proof that prior to the critical date [i.e, more than one year] the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at 67–68, 119 S.Ct. 304 (footnote added and omitted).

The Federal Circuit applied *Pfaff* in concluding that Brasseler's patent is invalid because, prior to § 102(b)'s one-year period, the inventors engaged in a sale even though the invention itself was ready for patenting. 182 F.3d at 889. Nor had the circuit ever recognized, as Brasseler advocated, a "joint development" exception to the on-sale bar. *Id.* The court also rejected several other arguments as without merit. *Id.* at 890–92.

Stryker argues that this is an "exceptional case" because Brasseler breached its duty of candor and disclosure to the Patent and Trademark Office (PTO), by (among other things): (a) failing to reasonably investigate the sale of the subject invention prior to the "on-sale" bar date; (b) applying for a patent without disclosing the "on-sale" facts; and (c) unjustifiably suing Stryker despite knowledge of the patent's invalidity. Doc. # 75 at 1–2. Brasseler denies Stryker's assertions and points out, inter alia, that Stryker ignores intervening changes (i.e., the *Pfaff* decision) in the law. Doc. # 82.

## III. *ANALYSIS*

### A. 35 U.S.C. § 285—General Standards

■ District judges determine the § 285 "exceptional case" issue. *Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*, 182 F.3d 1356, 1360 (Fed.Cir.1999). They find the facts[2] and determine first if the case is exceptional, then whether attorney fees should be awarded. *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1380 (Fed.Cir.1999). Their "discretion [is] informed by [their] familiarity with the matter in litigation and the interests of justice." *Badalamenti v. Dunham's, Inc.*, 896 F.2d 1359, 1365 (Fed.Cir.1990) (quotes and cite omitted).

### B. "Inequitable Conduct"

■ "Exceptional cases" include those involving "inequitable conduct" before the PTO. A patentee engages in inequitable conduct by failing to disclose material facts[3] which might otherwise preclude the

---

1. "A process is reduced to practice when it is successfully performed. A machine is reduced to practice when it is assembled, adjusted and used. A manufacture is reduced to practice when it is completely manufactured. A composition of matter is reduced to practice when it is completely composed." *Id.* at 57 n. 2, 119 S.Ct. 304 (quotes and cite omitted).

2. "[T]he decision respecting inequitable conduct is a discretionary decision to be made by the judge on his or her own factual findings.... Once threshold findings of materiality and intent are established, the court must weigh them to determine whether the equities

warrant a conclusion that inequitable conduct occurred." *Destron/IDI, Inc. v. Electronic Identification Devices, Inc.*, 121 F.3d 726, 1997 WL 414646 at * 5 (Fed.Cir.7/24/97) (unpublished) ("*Destron I*") (quotes and cites omitted); *see also PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 12 F.Supp.2d 69, 72 (D.Mass.1998); *Quikrete Cos., Inc. v. Nomix Corp.*, 874 F.Supp. 1362, 1369 (N.D.Ga. 1993).

3. A fact is "material" if a "reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Baxter Intern., Inc. v. McGaw, Inc.*,

issuance of a patent. *Enzo*, 188 F.3d at 1380–81; *Senior Techs., Inc. v. R.F. Techs., Inc.*, 58 F.Supp.2d 1076, 1093 (D.Neb.1999). Omitted "on-sale bar" facts can be material facts. *Enzo*, 188 F.3d at 1380–81. But they must be both material *and* form part of the "threshold level of intent to mislead the PTO." *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 719 (Fed.Cir.1998); *Baxter*, 149 F.3d at 1327. "The more material the omission, the less evidence of intent will be required in order to find that inequitable conduct has occurred." *Baxter*, 149 F.3d at 1327.

### C. Standard for Showing Inequitable Conduct

■ Section 285 movants must show inequitable conduct by clear and convincing evidence in light of § 285's purpose: "to provide discretion where it would be *grossly unjust* that the winner be left to bear the burden of his own counsel which prevailing litigants normally bear." *Badalamenti*, 896 F.2d at 1364 (quotes and cite omitted; emphasis original).

Pointing to evidence submitted on this motion, Stryker contends that Brasseler engaged in inequitable conduct because its patent counsel knew or should have known of "other inventor" and "on-sale" facts when he filed Brasseler's patent application, thus violating Brasseler's duty to inform the PTO of them. Doc. # 75 at 1–2. Had he upheld his duty, no patent would have issued and this litigation would not have occurred. These "exceptional circumstances," Stryker concludes, justify awarding § 285 attorney fees to it. *Id.*

149 F.3d 1321, 1327 (Fed.Cir.1998) (quotes and cite omitted).

4. Stryker references this as a "prior art" case. *See* doc. # 75 at 6 ("Sales of products embodying the invention, known by the [patent] applicant to have occurred more than one year prior to filing, is prior art and falls within the duty of disclosure"). "Prior art" encompasses disclosure by sale, *see Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353, 1357 (Fed.Cir.1999) (a sale can "ren-

### (1) Mere Negligence

A "knew or should have known" contention bespeaks simple negligence, which typically is not enough:

> [O]ne who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of: (1) prior art[4] or information that is material; (2) knowledge chargeable to applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from *an intent to mislead* the PTO.

*Senior Technologies*, 58 F.Supp.2d at 1094 (quotes and cite omitted; emphasis and footnote added); *Union Oil Co. of Calif. v. Atlantic Richfield*, 34 F.Supp.2d 1208, 1211–12 (C.D.Cal.1998); 60 AM.JUR.2D *Patents* § 1045 (1985 & 1999 supp.). Once the "intent" showing is made, the patentee can rebut

> by a showing that: (a) the prior art or information was not material (e.g., because it is less pertinent than or merely cumulative with prior art or information cited to or by the PTO); (b) if the prior art or information was material, a showing that [the] *applicant did not know* of that art or information; (c) if [the] applicant did know of that art or information, a showing that [he] *did not know of its materiality;* (d) a showing that [the] applicant's failure to disclose art or information did *not* result from an intent to mislead the PTO.

*Senior Technologies*, 58 F.Supp.2d at 1094 (quotes and cite omitted; emphasis added); *accord Elk Corp. of Dallas v. GAF Bldg.*

der[ ] the claimed invention obvious by its addition to the prior art") (quotes and cite omitted), as well as, for example, publication. *See, e.g., Abraskin v. Entrecap Corp.*, 55 F.Supp.2d 224, 228 (S.D.N.Y.1999). The disclosure must be enough to enable a person of ordinary skill to devise the invention "without further genuine inspiration or undue experimentation." *Senior Technologies*, 58 F.Supp.2d at 1092 (quotes and cite omitted).

*Materials Corp.,* 168 F.3d 28, 30 (Fed.Cir. 1999).

## (2) Gross Negligence

The § 285 standard generally also requires movants to show more than gross negligence:

Although intent may be inferred from circumstantial evidence, *mere gross negligence* is insufficient to justify an inference of an intent to deceive the PTO. In a case involving an omission of a material reference to the PTO, there must be clear and convincing evidence that the applicant made a *deliberate* decision to withhold a known material reference.

*Baxter,* 149 F.3d at 1329 (quotes and cites omitted; emphasis added); *accord Recycling Sciences, Int'l, Inc. v. Gencor Indus., Inc.,* 1999 WL 160060 at * 4 (N.D.Ill.3/12/99) (unpublished); *Mitek Surgical Prods., Inc. v. Arthrex, Inc.,* 21 F.Supp.2d 1309, 1317 (D.Utah 1998). The clear and convincing evidence standard acts as

an essential safeguard to protect innocent parties from unwarranted forfeiture, *Tol–O–Matic, Inc. v. Proma Produkt-Und Marketing Gesellschaft m.b.H,* 945 F.2d 1546, 1554 (Fed.Cir. 1991), particularly "given the ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive." *Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 939 (Fed.Cir.1990).

*Newell Window Furnishings, Inc. v. Springs Window Fashions Div., Inc.,* 1999 WL 1077882 at * 2 (N.D.Ill.10/7/99) (unpublished).

## (3) Inferring Intent

Since errant parties rarely confess, courts have long recognized that such "deliberate" intent "can be inferred from the actor's conduct and surrounding circumstances." *Destron/IDI, Inc. v. Electronic Identification Devices, Ltd.,* 178 F.3d 1313, 1999 WL 37614 at * 1 (Fed.Cir.1/26/99)

(unpublished) ("*Destron II*"); *accord Elk Corp.,* 168 F.3d at 32. But in a sense this can open the evidentiary door to evidence of gross or even mere negligence:

In [*FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411 (Fed.Cir.1987)], the court held that one alleging "failure to disclose" type inequitable conduct must prove clearly: (1) prior art exists that is material; (2) that the applicant *or* his attorney knew of this art and that it was material; and (3) that applicant failed to disclose it because of "an intent to mislead" the PTO. Other Federal Circuit cases have added that the degree of "intent to mislead" that triggers culpability *varies.* Finding the precise amount required in a particular case involves balancing culpability against materiality.

*Quikrete,* 874 F.Supp. at 1368 (emphasis added), *aff'd,* 34 F.3d 1078 (Fed.Cir.1994). "[T]his rule can be difficult to apply," *id.,* but the Federal Circuit recently provided some clarification:

A patent applicant's duty to disclose material information to the PTO arises under the general duty of candor, good faith, and honesty embodied in 37 C.F.R. § 1.56(a) (1996).[5] Specifically, applicants have a duty to disclose to the PTO information of which they are aware which is material to the examination of the application. 37 C.F.R. § 1.56(a) (1996). This duty is also applicable to reissue proceedings. 37 C.F.R. § 1.175(a)(7) (1996).

However, a breach of the disclosure duty alone does not render the patent uneneforceable. There must be a showing of inequitable conduct. Inequitable conduct resides in the failure to disclose material information with an intent to deceive or mislead the PTO. Once thresholds of materiality and intent have been established, the court conducts a balancing test and determines whether the scales tilt to a conclusion that "ineq-

5. This rule has not changed since 1996. *See* 37 C.F.R. § 1.56(a) (1999).

uitable conduct" occurred. The *more* material the omission or the misrepresentation, the *lower* the level of intent required to establish inequitable conduct, and vice versa.

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed. Cir.1997) (quotes and cites omitted; emphasis and footnote added), *cert. denied*, 523 U.S. 1071, 118 S.Ct. 1510, 140 L.Ed.2d 665 (1998). The *Critikon* court somewhat retreated from the deliberate intent standard. After recounting the evidence in that case, where the patentee and its counsel simply failed to disclose ongoing litigation and a prior patent to the PTO, the court emphasized that "intent may be inferred where a patent applicant *knew, or should have known,* that withheld information could be material to the PTO's consideration of the patent application." *Id.* at 1256.

In finding that two of the patentee's patents were invalid due to the inequitable conduct of failing to disclose those material facts, the *Critikon* court did not excuse the patentee for failing to appreciate the legal significance of the facts that it failed to disclose, 120 F.3d at 1256–57, but instead charged it with its counsel's knowledge. *Id.; see also Quikrete*, 874 F.Supp. at 1368 ("that the applicant *or* his attorney knew of this art and that it was material") (emphasis added).[6] It then reminded patent applicants

> that close cases should be resolved by disclosure, not unilaterally by [the] applicant. This sentiment is also repeatedly reflected in the Manual of Patent Examining Procedure (MPEP), which, although it does not have the force of law, is well known to those registered to practice in the PTO and reflects the presumptions under which the PTO operates.

Presumably, applicants will continue to submit information for consideration by the Office in applications rather than making and relying on their own determinations of materiality. An incentive remains to submit the information to the Office because it will result in a strengthened patent and will avoid later questions of materiality and intent to deceive.

*Id.* (quotes, brackets and cites omitted). The court concluded that

> [n]o single factor or combination of factors can be said always to require an intent to mislead; yet a patentee facing a high level of materiality and clear proof that it *knew or should have known* of that materiality, can expect to find it difficult to establish "subjective good faith" sufficient to prevent the drawing of an inference of intent to mislead. [In such circumstances,] a mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances.

*Critikon*, 120 F.3d at 1257 (emphasis added).

## D. The Record Evidence

The "sum total of [Brasseler's] conduct," Stryker contends, demonstrates § 285–level intent to defraud the PTO. Doc. # 75, 83. The record shows that, at some point prior to April, 1993, A.M. Miller, R.L. Stranahan (the inventors), and possibly others either invented or claimed to have invented the "surgical saw blade" at issue. *See* doc. # 28 at 2, exh. A; *but see* doc. # 75 at 12–15 (alleging that the claimed inventors pirated the idea from Gregory May and passed it on to "DS Manufacturing" (DSM)).

---

**6.** This result follows a logical construct. Those who employ patent counsel ought to be charged with basic legal knowledge, for that is the point of hiring patent counsel in the first place (to benefit from counsel's specialized knowledge of patent procedures and obligations and thus ensure a successful patent filing). In theory, then, courts would not be justified in imputing knowledge of basic legal requirements to those who attempt a *pro se* filing.

DSM and Brasseler are separate entities, doc. # 28 at 8, 13–14; # 29 at 3 ¶ 7, and Brasseler admits that DSM shipped at least 3,250 of the blades to Brasseler as of 4/13/92. Doc. # 29 at 3 ¶ 9; # 28 at 7–12; # 33 at 1. Brasseler filed the patent application in question on 4/30/93, doc. # 28, exh. A at 1, so the 4/30/92 on-sale bar date applied to invalidate it (i.e., the 4/13/92 sale fell outside the one-year, 4/30/92—4/30/93 bar date).

When Brasseler employed patent counsel to file its patent, then, counsel's focus should have been on whether anything that could constitute an invalidating sale or other public disclosure occurred prior to 4/30/92 (one year prior to Brasseler's 4/30/93 filing date). Stranahan, a claimed inventor who literally owned DSM and who filed a post-application inventor's declaration wherein he acknowledged his 37 C.F.R. § 1.56 disclosure duty, therefore is chargeable with knowledge of the sale and, under *Critikon,* had a duty to inform the PTO of it (either directly or through counsel). At a minimum, he should have informed counsel of the sale. Nor is there any dispute that, had he inquired, patent counsel could have informed himself about the 4/13/92 sale both before and after he filed the application. Doc. # 82, exh. 3.

In fact, attorney C.W. Brody's only explanation for not inquiring as to pre-§ 102(b) time period sales is that (a) he was "rushed"; and (b) he relied on what another lawyer told him. Doc. # 75, exh. T at 33–36. Brody was an associate at the law firm Brasseler employed when partner R.L. Price instructed him, on 4/27/93, to "rush-file" Brasseler's patent application by 4/30/93. Brody understood that he was to do so to beat what he presumed to be a 5/1/93, § 102(b) deadline. Doc. # 75, exh. T at 14, 32–33; doc. # 82, exh. 3 ¶¶ 9–10.

Brody now explains that, because Price told him to get the patent application filed before 5/1/93, the one-year, invalidating event *must have* occurred no earlier than 5/1/92. *See* doc. # 75, exh. T at 43–44; doc. # 82, exh. 3 ¶¶ 9–10. The Court presumably is to infer that this somehow excused Brody from asking Brasseler and the inventors if any § 102(b)-invalidating event occurred before then.

The Court will do nothing of the sort. It is patently reckless to accept a file from another lawyer and then sign one's name to a patent filing without taking ten minutes to verify basic filing-deadline information (e.g., calling the inventors and asking them if there had been any pre-4/30/92 sales or other disclosures). In that regard, the Court finds it telling that Brasseler has not seen fit to adduce any testimony from Price showing that Price himself had conducted a reasonable investigation.

The Court therefore is left to conclude that Stranahan or an interested party (e.g., Miller) realized the 4/13/92 sale likely might present a § 102(b), on-sale problem (hence, the sale was a material fact) and, sensing it was too late, simply told Price to rush-file the application and do the best he could. Price then evidently passed the task on to an associate, but knew from experience that it would take a few days to rush-file, so he set a new (but artificial) "deadline" date (5/1/93) under a "so let's get it as close as we can" decision to cut Brasseler's delay losses.

This conclusion is reinforced by the remainder of Brody's declaration. He emphasizes that he had "less than three days to review the disclosure materials, speak with the inventors,[7] prepare a detailed description of the drawings, edit and revise the application, forward the application for the inventors' comments, and file [it] by [4/30/93]." Doc. # 82, exh. 3 ¶ 10 (footnote added). His preparation of the patent application, he maintains, is "well below the average time required to prepare and file a

---

7. He does not state whether he actually did speak with the inventors. On deposition, he claimed he could not recall asking them about

any § 102(b) facts. Doc. # 75, exh. T at 33–34.

patent application meeting [the 35 U.S.C. § 112] standards." *Id.*

Brody repeated his "no time to thoroughly investigate" rationale during his deposition. Doc. # 75, exh. T at 33. Despite his claim to being short-timed, the fact that he did not take a few minutes to ask a simple question—just what sort of § 102(b) bar might be involved—evinces a willful-ignorance level of intent. The Court is thus not surprised that Brody conveniently "could not recall" asking Alex Miller, one of the claimed inventors, about any invalidating information. *Id.* at 36. Nor is it surprised that Brody makes the same "can't recall" claim when asked whether he asked Price about any invalidating information. Doc. # 75, exh. T at 33–36.

In the meantime, Brody acknowledges a post-filing investigation/disclosure duty, doc. # 82, exh. 3 ¶ 12, but he provides no explanation for why he did not uphold it. He repeatedly relies on what *someone* (Price?) told him (i.e., that some invalidating fact existed as of 5/1/92, *see id.* ¶¶ 9, 14), but does not explain who, nor why he did not inquire about any sales or prior art arising beyond that one-year, pre-filing period. He reasons:

> To the extent that the facts are stated in the Federal Circuit opinion related to this matter, (182 F.3d 888), analyzing whether such facts constituting an on-sale bar or are material for the [PTO's] purposes under the totality of the circumstances test is clearly a judgment call whereby reasonable patent lawyers could differ.

Doc. # 82, exh. 3 ¶ 16.

Brody's argument that reasonable counsel might differ under the pre-*Pfaff,* totality of the circumstances test is irrelevant in light of his claim that he did not even know of the 4/13/92 sale. Hence, there is no subjective good faith judgment on his part for the Court to consider. Moreover, the

sale was a highly material fact under both pre- and post-*Pfaff* standards.

Brody also acknowledges, as "accepted practice," that patent counsel can go ahead and file when faced with a short deadline, but then must duly investigate and amend the application within a reasonable time thereafter. Doc. # 82, exh. 3 ¶ 12. Yet, he fails to furnish a reason why he (or follow-up counsel) failed to do just that after he filed Brasseler's patent application. He tiptoes around this by repeating the same circular explanation: because Price told him *only* about "a potential bar date in May, 1992," *id.* ¶ 14, that was his *only* understanding, so he "took the appropriate action consistent with the established practice[ ] of preparing patent applications based on the statutory bar date information known to [him] at that time." *Id.*

However, no one—not even Brody nor "expert witness" attorney Wettach[8]—has shown this Court that simply accepting a fellow lawyer's instruction to file by a particular date discharges filing counsel's duty to make the most basic inquiry of the patentee. For good measure, Brody proffers his opinion that his filing was within the bounds of normal patent practice since discovery of the earlier sale could be cured by subsequent disclosure to the PTO. *Id.* Yet—and this is perhaps most telling— Brody then *fails* to candidly state to this Court why he did not make any subsequent inquiry and disclosure of a fact otherwise imputable to Stranahan.

The reason why Brody did not conduct any post-filing investigation is obvious: because he did not want to learn of any earlier sales and thus have to disclose them to the PTO. Even to this day Brody insists he *still* does not know those otherwise highly material facts: "I did not know of nor analyze the facts of the Brasseler-[DSM] transaction at the time of the filing, nor do I know all the facts at this time." *Id.* ¶ 16. That only underscores the stud-

8.  *See* doc. # 82, exh. 2.

ied ignorance that he carefully cultivated, and certainly explains the high-spun word-play both Brody and Wettach[9] now employ.

The record shows that someone from Brasseler (or on its behalf) obviously contacted Price, who turned to Brody too late in the game (on 4/27/93; the cut-off date was 4/13/93) to get Brasseler's patent application filed. That "someone" had to have been tipped off by something. Because Brasseler has failed to tell the Court who contacted Price and what alerted him or her to do so, the Court concludes that it must have been the 4/13/92 sale (Brasseler conspicuously fails to point to anything else).

Whoever contacted Price, then, obviously did not put two and two together until it was too late. Price (again, the Court has not heard from him) nevertheless evidently decided to get the patent application quickly filed and hope for the best. So, he simply gave Brody a deadline, and Brody evidently picked up on the problem, as evidenced by his studied refusal to make even the most basic of inquiries (e.g.: "Were there any sales or other reductions to practice beyond the statutory one-year period?"), and insistence that his pre- *and* post-filing duty to inquire/disclose was somehow (he does not even bother to try and explain) excused merely by Price instructing him to file by 4/30/93.

It also is telling that neither Brody nor any follow-up patent counsel provides this Court with an explanation for why no one asked Miller and Stranahan any § 102(b) questions in June, 1993, months after the application, when they were furnished an inventor's "Declaration, Power of Attorney, and Petition." Doc. # 75, exh. L. There the inventors obligated themselves "to disclose information which is material

to the examination of [the] application in accordance with [37 C.F.R. § 1.56(a)]." Doc. # 75, exh. L. Under that regulation,

> Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim *until* the claim is canceled or withdrawn from consideration, or the application becomes abandoned.

*Id.* (emphasis added).[10]

Where inventors employ patent counsel, it is fair to charge them with knowledge of legal requirements and the corresponding factual disclosure requirements regarding basic, "building block" level, material information such as whether there has been a prior sale. This is clearly implied by case law standards in the "failure to disclose," inequitable conduct realm. *See, e.g., Quikrete,* 874 F.Supp. at 1368 ("that the applicant *or* his attorney knew of this art and that it was material") (emphasis added).

As the *Critikon* case shows, this view embraces the realities of the patent process, *see Seiko Epson Corp. v. Nu–Kote Intern., Inc.,* 190 F.3d 1360, 1367–72 (Fed. Cir.1999) ("intent to deceive should be determined in light of the realities of patent practice") (quotes and cite omitted), one which revolves around the basic requirement that "patent applicants and their patent attorneys ... disclose to the PTO information of which they are aware which is material to the examination of the application." *Mycogen Plant Science, Inc. v. Monsanto Co.,* 61 F.Supp.2d 199, 269 (D.Del.1999).

---

9. Stryker properly notes the fact that "Wettach never gives an opinion as to whether he *personally* would have performed an investigation and submitted the on-sale information to the [PTO]." Doc. # 83 at 4 (emphasis added).

10. The regulation warns that "no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct." *Id.*

That means that inventors cannot "empty-head" their own patent counsel, and patent counsel cannot shirk basic, § 102(b) factual inquiry requirements. Nor could Brody (or follow-up counsel), months after the filing, assist purported inventors Miller and Stranahan in filing executed inventor declarations—documents which literally cite to 37 C.F.R. § 1.56(a)—yet ignore that declaration's very reminder to reasonably inquire and thus disclose any § 102(b)-invalidating facts to the PTO. *See Destron I,* 1997 WL 414646 at * 4 ("Applicants have a duty to disclose all information, including uses and sales of [their] invention more than one year before [they] filed [their] application, if such information would be deemed material") (cite and quotes omitted).

In that regard, Brody's declaration also conspicuously minimizes the fact that a patentee's disclosure duty is ongoing and does not end once the patent application is filed. *See* 37 C.F.R. § 1.56(a) (1999) ("the duty to disclose *information* exists with respect to each pending claim until the claim is canceled or withdrawn from consideration, or the application becomes abandoned"); *Kimberly–Clark Corp. v. Procter & Gamble Distributing Co.,* 973 F.2d 911, 917–18 (Fed.Cir.1992); *D.O.C.C. Inc. v. Spintech, Inc.,* 1994 WL 872025 at * 11 (S.D.N.Y.1994) (unpublished) ("That a continuing duty of disclosure exists during the period between payment of the issue fee and the issuance of the patent has been expressly recognized by the Federal Circuit").

■ In short, no one disputes that material facts might be legitimately overlooked (even out of gross negligence) during a "rush-filing." But patent counsel's studied refusal to timely investigate and disclose after the fact easily supplies the inequitable conduct needed to satisfy 35 U.S.C. § 285. To that end, both Brody and Wettach invoke the post-filing change in judicial standards (*Pfaff*) to excuse Brasseler's failure to disclose the 4/13/92

sale to the PTO. *See* doc. # 82, exh. 2 ¶ 4; exh. 3 ¶ 16.

What they ignore, however, is the fact that under both the "totality of the circumstances" as well as under the two-part, *Pfaff* standard, the 4/13/92 sale was a *highly material* fact. Indeed, the Federal Circuit cited a 1985 case when it flatly stated: "The transaction at issue *undisputedly* was a 'sale' in a commercial law sense." 182 F.3d at 890 (emphasis added). And whether the invention had been reduced to practice by that point was not even an issue.

Even if it was, the fact that the saw blades had been sold in such a large quantity by 4/13/92 gave every indication that the invention had been reduced to practice and likely would be found to constitute a sale, or at least arguably so. That is more than enough to make that fact highly material, *see Critikon,* 120 F.3d at 1257 ("close cases should be resolved by disclosure, not unilaterally by applicant") (quotes, cite and alteration omitted) and thus disclosable to the PTO, which was the proper party to make that judgment under the totality of circumstances (since revised to the *Pfaff*) test. Patent counsel's studied avoidance of that fact makes this a § 285 case.

It also cannot go unnoticed that Stryker, while defending a costly lawsuit, had to draw out many of the very facts that Brody should have disclosed to the PTO. *See, e.g.,* doc. # 82 at 7 n. 1. Had Brody done so, it is reasonably probable that the PTO would not have granted Brasseler the subject patent (*see Brasseler,* 182 F.3d at 890 ("The transaction at issue **undisputably** was a 'sale' in the commercial law sense") (emphasis added)). Brasseler thus would not have been able to commence this proceeding against Stryker, causing it to incur the fees it now seeks to recover.

This fact entitles Stryker, which has waived any claim for fees incurred on appeal or in compiling its fee-motion, doc.

# 75 at 20, to its attorney fees.[11] It therefore is not necessary to reach Stryker's alternative arguments. *See* doc. # 75 at 12–20. Brasseler nevertheless further argues that Stryker's $456,059.36 fee claim should be pared down to only the issue (i.e., the on-sale bar) on which Stryker prevailed. Doc. # 82 at 14–16. Brasseler overlooks the fact that it raised a large damages claim against Stryker. *See* doc. 1 at 5 (triple damages plus § 285 fees). In response, what litigant would not be inclined to explore all available (non-frivolous) defenses?

■ Indeed, few would do otherwise, and Brasseler does not show that Stryker's alternative defenses were legally frivolous. It is therefore fair and reasonable that Stryker likewise should recover for litigating the cost of its alternative defenses. *See Mathis v. Spears,* 857 F.2d 749, 756 (Fed.Cir.1988) (When a prevailing party "has obtained excellent results, his attorney should recover a fully compensatory fee .... Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of *or failure to reach* certain grounds is not a sufficient reason for reducing a fee. The result is what matters") (quotes and cite omitted; emphasis original).

Finally, Brasseler does not otherwise challenge the reasonableness of Stryker's fee request, so that claim is unopposed. *See* S.D.Ga. Local Rule 7.5 ("Failure to respond shall indicate that there is no opposition to a motion"); *U.S. v. Burkhalter,* 966 F.Supp. 1223, 1225 n. 4 (S.D.Ga. 1997) ("It is not the province of this Court to raise issues on behalf of litigants before it"); *GJR Investments, Inc. v. County of Escambia, Fla.,* 132 F.3d 1359, 1369 (11th Cir.1998) ("legal parameters of a given dispute are framed by the positions advanced by the adversaries, and may not be expanded *sua sponte* by the trial judge") (internal quotes and cite omitted).

## IV.  *CONCLUSION*

Accordingly, the motion of defendants Stryker Corporation and Stryker Sales Corporation for attorney fees (doc. # 74) is *GRANTED.*

---

11. The Court has considered Brasseler's other arguments (e.g., that Stryker did not argue to the Federal Circuit that Brasseler's appeal was frivolous or brought in bad faith and this shows that this is not an "exceptional" case; that Stryker, by waiting some two months to move for summary judgment after Brasseler disclosed the "on-sale" evidence to it, therefore exhibited its own doubts regarding the materiality of the DSM/Brasseler sale, *see* doc. # 82 at 7–8) and finds them facially meritless.